Mr. Henrath, please proceed. Thank you, Your Honor. May it please the Court. The error committed below is two-fold. First, the District Court conducted its Alice analysis of Berkheimer's method claims in an oversimplistic manner, untethered to the claim language, as informed by the 713 specification. By doing so, it ignored how the claims improve computer functionality and database systems by claiming a specific manner how... Would it be fair for me to characterize one of your arguments, the one that you're going to now, as in the following way. Whether something meets Alice Step 2, and in particular whether it's well-known, conventional, and routine, the language from Mayo, is a question of fact. And on summary judgment, that question of fact can only go against you if there's no genuine dispute of fact. And your specification itself, in particular in column 2, when it says known asset management systems didn't do this, didn't have this, couldn't do this, that that is evidence that created at least a question of fact that should have precluded summary judgment. Yes. That and, in addition, all the facts stated in Berkheimer's Rule 56.1 statement. Elude Packard advanced its motion as a pure matter of law, saying just look at the claims and apply Alice. They did not have any counter facts. There was no prior art before the court. Well, they introduced expert testimony, right? Well, no, that was not in their local Rule 56.1 statement of fact. It was in violation of that Merrillville v. Westenberg case that summarized 15 years of Northern District of Illinois Rule 56 jurisprudence. In other words, they cited to the record and didn't rely upon anything in the statement of facts as you're supposed to do under summary judgment procedure. Did the district court address either to rely on or to reject as procedurally improper? Was it Schoenfeld? Is that a Schoenfeld declaration? On the 112 issue, it did have a footnote saying that his naked conclusion was a, quote, factual finding. I think that's counter to cases in this circuit. But it remained silent on the 101 issue facts. And concerning the 101 issue. But even if they did have an expert declaration on 101, wouldn't that at best just create a question of fact in light of your specifications assertion? Yes, we had counter experts. I guess my 101 argument. What about your specification? Pardon me? What about your specification, statements in your specification? Even if you didn't have a counter expert, would a statement in the specification about how something is different and is an advantage of the invention, could that be something that could create a genuine issue of fact? If there's also evidence from an accused infringer suggesting that the invention is conventional. Exactly. Most certainly. Because, in fact, the patent should have been viewed in its best light and taken as true. And if the court was going to say, oh, it's just a pure matter of law. I think that what's important is that the Claim 1 method steps does not occur in off-the-shelf, out-of-the-box generic computers of October 2000, the priority date of the application. Rather, Claim 1 structurally defines a specific programming and specific manner of digital archiving to improve computer functionality. What is important is the first two steps, whereas construed by the district court, a human-readable source code item is presented to a parser that parses the item into something distinctly different. A plurality of multi-part machine-readable object structures wherein portions of the structures have searchable information tags. Now, the multi-part object structure is the key phrase of Claim 1. It was not construed below. What they are and what is done with them is the crux of this appeal. We think the phrase is rich in meaning, just like the programmable operational characteristics of visual memory or the self-referential database in ENFISH, because this parsing is a data transformation into a new resultant particular level of object structure. Now, the specification informs that the multi-part object structures are document and graphical object-oriented data, metadata, elements, properties, values, and their relationships. This is not a parsing of a source code item into its machine language composite. Rather, it's a parsing into the multi-part object structures that provides access to each of the input items, data, metadata, elements, properties, and values in a manner separated from and isolated from the composite form, not constrained by the composite form, segregated from each other, and in machine language for object-level control and processing. Prior digital asset management systems saved thousands of documents and graphical items within an enterprise. Can I make sure I understand your argument? Is it your argument that the improvement here is from the ordered combination in the claim? You're not arguing that the individual claim elements are somehow novel or non-conventional. I do think it is not abstract under ALICE Step 1 because of the improved computer functionality, and we also argue inventive concept under ALICE Step 2. Okay, so we're referring to Step 2. Is it your position that there's a particular limitation in Claim 1 that was never performed before? Well, on ALICE Step 2, the inventive concept in the claims is the establishment of a reconciled object structure archive in accordance with predetermined standards and rules at an object level to reduce redundancy. We say the multi-part object structures is novel, is a point of difference and very rich in meaning. And one reason for that is that- Where did you argue that in your brief? I must have missed that. Well, we argued that under ALICE Step 1, we have improved computer- No, we're not talking about ALICE Step 1. We're talking about ALICE Step 2 and where is the improvement. I mean, I understood the improvement to be predominantly the one-to-many functionality, which is repeatedly touted throughout your spec as not being known in the prior art and able to achieve enormous efficiency in the computer functioning. We also argued the reduced redundancy of the objects and relationships stored in the archive and the enterprise-wide multifaceted control of objects and their relationships and their integrity at a machine language object level to conform to design rules and production standards, to implement object control procedures such as access security workflow, and to distribute approved objects for enterprise-wide use and reuse in the outputting of items as well as other benefits and efficiencies, time savings, etc. And this comes from the fact that in the old use of storage of documents and graphical items, when they were machine-readable, these items remained in their original composite state. To use any aspect of these items, you had to access the entire composite and then find what was needed to be worked upon within the item. It was a document-centric approach with multiple instances of common redundant elements throughout the archive. Claim 1 and the novelty in the inventive concept under ALICE Step 2 departs from this model. The parsing transforms the composite into unique multi-part object structures unconstrained by the composite. To use the multi-part object structures, you need only access the object level aspect or attribute you need. And then these multi-part object structures can be controlled and reconciled per Claim 1 Steps 3 and 4. This is an entirely new and different efficient way of working with documents and graphical items. One unique object can be stored in an archive and shared via linkage to many others. Can I ask about something? There's some difference between the parsing the item limitation of Claim Element 1, a difference with respect to generality, and some of the spec material that your brief points to that says the parsing can be into objects assigned by the parser. Claim 1 doesn't require that. Well, the parser, in addition to parsing into the multi-part object structures, can tag such structures. Yes, and tag, right. But Claim 1 applies even to object structures that are, let's call it, inherent in the document, and you just identify them and tag them. That is, it's broader than the claim covers something that seems a whole lot more familiar than the richer functionality described in the spec of a parser that says, I'm actually not just looking at the pieces of a check, for example, that are apparent on the face. I'm going to unify into an object things that I'm going to decide should be unified, as opposed to the document already giving that to me. So I wonder if the claim is overbroad with respect to what I think your brief tries to identify is the improved aspect of Claim 1. We would disagree, and the reason for that is that you must focus on what is tagged, what is established for identification, linkage, and retrieval purposes. It is portions of the multi-part object structures that the tags are associated there with. It's not with respect to a machine language composite of a source code item. Rather, it is portions of the multi-part object structures that are so tagged, and then evaluated with respect to other object structures previously stored in the database for reconciliation with standards and rules. And this ultimately results in the reconciled database where one object can be stored as opposed to multiple instances of that object throughout a database. But that doesn't even come in until Claim 4. Claim 1 says nothing about storing a reconciled object. Yes, only Claim 1 has to. I think Judge Taranto's point is a valid one that you need to figure out how to respond to, both in terms of the breadth of the parsing limitation as claimed, as well as the fact that none of this storage in the archive stuff is part of Claim 1 either. Claim 1 is just vastly broad. So even if the archive storage somehow amounted to something new, which I don't see immediately how that's so in light of the record, but even if it did, that's not in Claim 1 either. Well, Claim 1 in its preamble defines the usage as a method of archival of an item in a computer processing system. And all claims need to do is claim. The specification teaches. The claim defines over the prior art, even at a stage before you say, now store it. We have the claim set up such that it is presented for reconciliation prior to storage. Sure, in a dependent claim, that storage does occur. But like I say, Claim 1 only needed to define over the prior art. I know that's a 102, 103, there could be 112 questions, et cetera. But concerning patent eligibility, there is a valid basis for the claim to be broad as it is. Can you remind me what happened in the district court with regard, and I know I'm speaking generally here, with regard to claim construction of some of the terms in Claim 1, terms like your reconciliation claim, terms like the, I guess, mostly the reconciliation and predetermined variance. What, if any, claim constructions narrow and define the scope of some of that language? Well, the claim construction concerning the parser and the parsing is a program that dissects and converts. Can you point me, what am I supposed to look at? There is, in the brief, we have a table of all the claim constructions. What page would you like us to look at? If I could come back and tell you the page, I don't have it readily memorized. But the parsing and presenting to a parser is a program that dissects and converts source code into object code to dissect and convert. Page 10 of your brief, I think. So be it if you have it there. You don't have it in front of you? No, I do not. But that given, the main term is the multi-part object structures. That was not a term that was construed by the district court. The constructions also say at steps 3 and 4 that you must analyze and compare the multi-part object structures with object structures previously stored in the database to determine variance with user-defined rules or predetermined standard. So those are the constructions. But the main term, and that which we think is like programmable operational characteristics of visual memory, is the initial parsing into multi-part object structures. If I could for a moment just say one thing about the 1.12 issue, as I see time is so limited. And that is, Berkheimer's system claims are not indefinite under the Nottle standard because the claim 1 phrase, we're in the archive, exhibits minimal redundancy and forms with reasonable certainty. It's uncontested. Okay, well we have your briefs on this point and you've used all your time, your rebuttal time, and two minutes extra. So let's hear from the other side at this point. Okay, thank you, Your Honor. Yes, Mr. Peterson? Please proceed. May it please the Court. William Peterson on behalf of Happily HP, Inc. You'll find the district court's claim construction on page 47 of the index, a chart at the end, listing all of the construed terms. And, Your Honor, let me begin with multi-part object structure, where my friend spent most of his argument. And I think what you heard is an argument that is based on a claim construction that was never urged to the district court. If Mr. Burkheimer had believed that multi-part object structure carried a very specific, detailed meaning, that this phrase was somehow the heart of the invention, that it was an innovative new data structure, the time to make that argument was in claim construction in front of the district court, not on appeal before this court. That's not a limitation that he's pressed for. Also note there's been no previous argument that the preamble to claim 1 is limiting. This district court held that each of the independent and dependent claims describe only steps that are well-known, well-understood, routine, and conventional computer functions. Isn't that a fact-finding, whether something is well-known, routine? And, I mean, district courts can make fact-findings on summary judgment when there's not a material dispute, obviously. But isn't that a fact-finding? No, Your Honor. I don't believe so. What case law do you have to suggest that? Well, I'll point out that this court routinely resolves inquiries under Section 101 at the pleading step, at the summary judgment step. If this court were to conclude— Yes, but in all of those cases, every case I've ever read, it was undisputed whether or not something was well-known, particular elements were well-known, routine, and conventional. Well, I think that's true. My understanding, though, is that it's undisputed that these elements were known and conventional. There's no dispute, for example, that parsing was well-known at the time of Mr. Berkheimer's invention. I'll point you to Mr. Berkheimer's testimony on that, which is— What about all the one-to-many functionality? When you say there's no dispute that's well-known, the patent itself seems to dispute that on its face pretty strongly. Well, the one-to-many editing, which is what an advantage the patent purports to achieve, simply results in the way the patent stores documents. And this is simply an abstract method of storing documents on a computer. And computers routinely store documents. This court has routinely recognized in its cases content extraction, various intellectual ventures cases, the electric power group, that what computers do is collect information, store information, analyze information. And what's important here—I think it's part of the Alice Step 2 inquiry— Yes, but just like in ENFISH, when you can have a data table that improves functionality because it reduces your need for repetitive or redundant storage, here, whether it's right or not at the end of the day, this patent alleges that the storage of redundant common graphical elements leads to inefficiencies and increased costs. Known asset management systems used in the graphic arts industry do not address this inefficiency in the storage of graphical documents or elements. They say this in two separate places. I read to you from Column 2. They also say it in Column 1. And then they expressly tie this in the patent to the one-to-many advantage, parsing out a graphical image that may be common across a number of documents and storing only it with a tag, so that when new documents come in, you don't have to store that graphical image again. You can just tag it. And then, if you want to make a change to it, it changes all of them at once. Whether it's true or not that known asset management systems didn't do this, the patent says it, and that's evidence. The intrinsic record is evidence. Well, yes, Your Honor, so two answers to that. First, let me explain why that is an abstract idea. The patent isn't—first, factually, the patent isn't offering a specific solution to the problems of implementing that sort of abstract idea. There are two particular places in the specification I'd like to draw you to. One is Column 6, and you'll see this—I believe it's line 21. It's Appendix Page 62. It will be understood that while a preferred data structure is disclosed and described, other data structures are usable without departing from the spirit and scope of the invention. I'm sorry, what were you just reading from? This is from Column 6 of the patent. I believe it's lines 21 through 24. I guess I don't understand what you mean for us to take away from that. Well, what I'd like to take away is the patent isn't claiming any particular data structure used to store these objects that it breaks the items going into the archive into. It's simply claiming the idea of break items going into an archive up into different objects and store them in generic data structures. The data structures aren't defined by any specific advances in the software arts, as you had in ENFISH with these self-referential tables that are compared to previous technical computer science questions. The data structures are simply generic data structures that are defined in terms of what they store. The parts are simply a generic computer program that's defined in terms of the result that it accomplishes. So you're not really seeing anything other than take an abstract idea and apply it on a computer. So, just to make sure I understand your position, I think what you're saying is you think the one-to-many feature is just a benefit that results from the abstract idea you find in, like, Claim 1. Absolutely, and let me talk about this abstract idea. So imagine a company that hires new employees, gives new employees documents when they show up at work. Think of a law firm. If you're a new partner to a law firm, you get a packet of documents. If you're a new associate, you get a packet of different documents. If you're a new secretary, you get a packet of different documents. Now, you could imagine that there would be a law firm, even though there's some overlap between the documents that are given to these new employees, you could imagine a law firm that had one copy of, here are the new partner documents, here are the new associate documents, here are the new secretary documents. The problem is that everyone gets a new copy of the parking policy, everyone gets a new copy of the information technology policy. So if you have to change your IT policy, you then have to change, here's the new IT policy, we're going to change it in the partner materials, change it in the associate materials, change it in the secretarial materials. Of course, that's not how companies actually store these materials. If everyone gets a copy of the new IT policy, if everyone gets a copy of the parking policy, they just have one copy of that parking policy in their files. And then when a new partner comes in, they take the partner-specific documents, photocopy those, and photocopy the partner, the parking policy, and hand it to them. If a new associate comes in, they photocopy the associate-specific documents, photocopy the parking policy, and hand it to them. So that when you change the parking policy, you change it in that one place in your file system, and then when you create the new packet... Ah, see, that's the difference. When you create a new packet, here, what this computer goes to is changing all the ones that were already distributed to people. I mean, that's the critical difference. Every document stored in this system that has a tag that relates to that graphical image will automatically be short. The difference, you're hypothetical, and what you want me to see is what this does is it actually changes the ones that are already in the hands of all the people you distributed it to. Because each of those people represents a file where that graphic image is tagged. So wouldn't that be remarkable? Wouldn't it be remarkable if in paper world you could make a change on your master copy, and it wouldn't just change the ones you give to new employees, but it changed the ones you gave to all the stored employees that are otherwise already in your register? Your Honor, respectfully... That would be a shocking invention. I think that's simply an advantage that comes generically through the use of a generic computer. But it doesn't, because a generic computer doesn't break things apart. Recognize items that are likely to be high replicated graphical images, store them separately and tag them, then recognize when new documents come in that that same item is present, and don't store it because they can just store the tag and thereby save a lot of memory. And then on top of all that, the advantage of, oh, and if I just make a change to the master file, it automatically will repopulate in every single one of those stored documents. Well, Your Honor, what I'd say is that... It just doesn't seem like generic use of computer. I'm not aware of generic computers that did that already. Well, I'd say it's actually extremely similar to what's routinely done in relational databases, which date back to the 70s. Except that's not in the record. Remember I started this by saying what's in this patent may not be correct, and it may not prevail at the end of the day. But for me, why doesn't it preserve a case beyond at least the summary judgment stage when the patent itself says known asset management systems didn't know how to do this. And as a result, they were inefficient. They used more memory. They took more time. This process saves computer memory, storage, processing time, et cetera, et cetera, et cetera. So regardless of whether all of that proves to be true at the end of the day, why isn't the patent's representations about that at least evidence that precludes a grant of summary judgment on that point? Your Honor, the problem is that the reason that abstract ideas are not patentable is not that they don't have advantages to them. Look at the Supreme Court's decision in Mayo. Applying natural laws, discovering natural laws, often covers a great many advantages. If, as the patent suggests, this is a truly new abstract idea, Mr. Berkheimer, who was in advertising and not in software development, came up with something clever and new to use a computer for, there's nothing that says this wouldn't have advantages associated with it. I can invent the abstract idea of make objects out of metal. But see, Mr. Berkheimer would disagree with your statement. He would say I didn't just come up with something clever and new to use a computer for. He would say I came up with a way to improve the computer by reducing. This is something that we need computers to do every day, but the computer itself isn't set up to do it in an efficient way. The computer itself isn't set up to do it in a way that reduces the amount of memory that needs to be stored. I think Mr. Berkheimer would respond to your point by saying, no, I'm like DDR. I'm an improvement in the technology of the computer. What if it's an improvement in the technology of the computer and the ability to make the one-to-many editing? It's a more efficient way to edit on a computer. Why wouldn't that fit within DDR or EnFish as being a technical solution to a technical problem, even if the individual elements of the claim are conventional, but it's the ordered combination that wasn't done before? Or at least there's evidence of that. What the district court recognized here, and I don't think Mr. Berkheimer has ever responded to, is that the sorts of problems that he's trying to solve, the problems of a need, as you put it, for many-to-one editing, the need to minimize redundancy in an archive, are the sorts of problems that occur in both pencil and paper archives and on computers. And so even if he restricts his solution to solutions involving a generic computer, that doesn't mean he's solving the problem in the software arts. And I'll note, when you look at what he said he was inventing, in his invention and specification itself, he's not talking about, I'm going to make computers work better, I'm going to give us faster computers, I'm going to generally improve computer software when it's used for all purposes. He tells us, and this is on page 60 of the appendix, column 1, that the invention pertains to digital asset management systems. It's computers maintaining archives. And archiving is a task for which a computer is used in its ordinary capacity. Now, Judge Moore, I think you're right, that he might have come up with a new way of using a generic computer. That he might have come up with a generic computer doing things that have... I never suggested he came up with a new way of using a generic computer. I always like to be called right, but not when actually it has nothing to do with what I said. I'm sorry, Your Honor. What I said was, I think he improved the functioning of the computer itself. Well, I was thinking of perhaps an earlier statement that you had made, which is that this is not something for which generic computers have been used before. And I'm sorry if I misunderstood your previous statement. But I do think that coupling a new abstract idea with routine and conventional use of a computer, that is, parsing, data manipulation, data storage, that doesn't lead to patent-eligible subject matter. I think really the key here should be on ALICE Step 2, which is, did Mr. Berkheimer add some type of inventive concept to this abstract idea of breaking documents into pieces before you put them into an archive? And when you start looking at the inventive concept... Not just breaking documents into pieces, but also being able to then modify those pieces and have it proliferate out over lots of documents instead of having to change them in series. And that's not found in Claim 1, which the district court treated as representative. Correct. And as the district court found, Mr. Berkheimer below treated Claim 1 as representative and didn't develop arguments... Page 1280 of the appendix. Let's take a look at it. Yes, Your Honor, I believe that's Mr. Berkheimer's four sentences on the dependent claim. Correct. For example, Claim 5 requires selectively editing an object linked to other structures to thereby affect a one-to-many change in the plurality of archived items. Such additional elements, yadda yadda yadda, add inventive concepts, as per the testimony of plaintiff expert Peter Nicholson. So he expressly argues in his briefing below that Claim 5, when he talks expressly about the one-to-many, adds an inventive concept. It seems clearly preserved to me. I would respectfully disagree and think the district court was well within its discretion to conclude that this is not a sufficient argument about the dependent claims. Simply to describe Claim 5 rather than fully developing an argument about why the many-to-one change in the plurality constitutes an inventive concept, add the abstract idea. I believe you'll find that on page, I'm sorry, appendix 14, note 6, is where the district court notes that Mr. Berkheimer had treated Claim 1 as representative. Okay. Is there any last-minute thought? Your time's up, but do you have a closing thought? No, Your Honor. I would just, if I may, point you to the claims in Intellectual Ventures v. Capital One, that's the 2017 case. I think they're remarkably similar here. The very first component claimed in that device claim is, in fact, a parser that breaks a document up into data objects. Just like Mr. Berkheimer, the patent owner in that case coined new terms for generic data types. This court readily concluded that those claims were directed to an abstract. Which of the IP cases? Just give me like an F-3rd volume. It's 850 F-3rd, 1332. Thank you, Your Honor. Thank you very much. Okay. We have a little bit of rebuttal time left. Your Honor, just a few points. First, concerning whether or not the findings of what was well-known, routine, or conventional with respect to the claims or the claim steps is not just a factual issue, but it also is exacerbated by the fact that we should be looking at this matter through the lens of October 2000. We are here 17 years removed, and we should give credence to the specification. My other point is that per Enfish, McGraw, visual memory fails, and a bunch of other cases, the 101 patent inquiry must examine the benefits and advantages taught by the specification as being attributable to the claims. And that is one of the difficulties we have here, is that the opinion below did not consult the specification as informing the patent claims or gave cursory review to the specification taught benefits and advantages. Concerning what was written or quoted out of the patent specification in column 6, that is referring to the patent specification's usage of postscript examples concerning input and output items. It has nothing to do with the claim language. And then finally, I would argue with respect to the Intellectual Ventures Capital One Finance case, that that case concerned the editing of XML documents with generic data structures, admitted to be generic by the patentee, and it was doing data manipulation all within the XML schema or its variants. There wasn't the transformation, the change of state from source code to machine-readable composite code. Now, all of a sudden, a new paradigm. We take the source code item and parse it into machine-readable plurality of multi-part object structures. So unless the court has further questions, I will submit the matter to the court and ask that this matter be reversed. I thank both counsel for their argument. The case is taken under submission. Our final case for argument today is 2017-1445, In Re NORD Development.